"**Confidential Information**" means all knowledge and data not generally known to the public, whether or not constituting trade secrets, that are disclosed to Franchisee by TPR or obtained by Franchisee by virtue of this Agreement or any training or other activities hereunder, or by virtue of the operation of the Franchised Business, including but not limited to:  (i) the Book of Standards; (ii) other written business procedures and communications concerning Live Test Prep; (iii) all student records, enrollment data, test results, and other student information; (iii) all instructor lists, supplier lists, equipment and material lists, and educational software programs, (iv) all mailing lists, prospect lists, marketing studies, marketing plans and techniques, and promotion and marketing aids; and (v) all business forms, accounting procedures, business plans, feasibility studies, and non-public financial information of TPR.

"**Franchised Business**" means the Live Test Prep business operated by Franchisee under the TPR Method and the Proprietary Marks pursuant to the terms of this Agreement.

"**Gross Receipts**" means all amounts received from the sale of all services and products by or from the Franchised Business, including the fair market value of any classroom space, materials, and other goods or services received in barter arrangements.  "Gross Receipts" does not include (i) any sales taxes, service taxes, value added taxes, and similar taxes collected by Franchisee from customers and transmitted to the appropriate taxing authorities; or (ii) any amounts refunded to customers for legitimate business purposes consistent with TPR's standards and procedures.  Gross Receipts shall not be reduced on account of any profits tax or income tax payable by Franchisee.

"**Managing Director**" means the individual approved by TPR to fulfill the duties described in Section 5.5 below.

"**Online Tools**" means, collectively, the online course tools that TPR generally makes available to students enrolled in Authorized Courses and the online pre-enrollment features that TPR makes available to prospective students of such courses.

"**Opening Date**" means the first day on which Franchisee conducts any of the Authorized Courses at a Site in the Territory.

"**Proprietary Marks**" means the mark(s) listed in Appendix B to this Agreement and such other trademarks, trade names, service marks, slogans, logos, and commercial symbols as TPR may designate from time to time for use with the Live Test Prep business in the Territory.

"**Reserve**" means the amount of fees prepaid by Franchisee under Section 8.8 below.

"**Site**" means a physical location within the Territory at which Franchisee conducts Authorized Courses and provides Authorized Services.

"**Start-Up Deadline**" means the date specified in Appendix A by which Franchisee must begin conducting Authorized Courses at a Site in the Territory.

"**Territory**" means the geographic area defined in Appendix A.

"**TPR Method**" means the comprehensive body of know-how, trade secrets, and business methods developed by TPR with respect to the Test Preparation Business; it encompasses TPR's proprietary educational materials, teaching aids, techniques, systems, and

formats, as well as TPR's mandatory and recommended operating procedures and specifications for equipment and facilities.

Other capitalized terms used in this Agreement have the meaning assigned to them in the Sections where they are used.

## 2. GRANT, INITIAL TERM, AND TERRITORIAL RIGHTS

2.1. <u>Grant of Franchise</u>. TPR grants to Franchisee the right, and Franchisee undertakes the obligation, upon the terms and conditions of this Agreement, to operate a Live Test Prep business under the TPR Method and the Proprietary Marks (solely as the TPR Method and Proprietary Marks pertain to the Authorized Courses and the Authorized Services) at Sites within the Territory.

2.2. <u>Initial Term</u>. The initial term of this Agreement (the "Initial Term") begins on the date of execution of this Agreement by TPR and shall end five (5) years from the Opening Date, unless sooner terminated in accordance with the terms of this Agreement. Franchisee shall have the opportunity to renew the rights granted hereunder, subject to the terms of Section 16 below.

2.3. <u>Limited Territorial Protection</u>. While this Agreement is in effect, TPR itself shall not, nor will it franchise or license any other party to, establish and operate a Live Test Prep business offering the Authorized Courses and the Authorized Services under the Proprietary Marks and the TPR Method at any location within the Territory.

2.4. <u>Rights Reserved by TPR</u>. Except as specifically provided in Section 2.3, TPR and its affiliates may engage in any business activities, under any name, in any geographic area and at any location, without any liability to Franchisee. For example, TPR and its affiliates reserve the rights to: (i) publish, market and distribute, within and outside of the Territory, any book, videotape, software, or content in any media; (ii) market and engage in the Test Preparation Business, including but not limited to delivery of courses in the Territory by means other than Live Test Prep, such as by "distance learning" or any other interactive teaching system or electronic means not requiring attendance of students at any fixed premises; and (iii) market and engage in the Admissions Services Business and the K-12 Services Business, directly or through others, by any means. Franchisee acknowledges that all rights relating to the exploitation of the Proprietary Marks and the TPR Method through or on the World Wide Web, Internet, and other ecommerce channels belong solely and exclusively to TPR and its affiliates. Franchisee agrees that TPR is entitled to all revenues from sales made by or through the World Wide Web, Internet, and other ecommerce channels, except sales of live, in-person Authorized Courses and Authorized Services to be delivered by Franchisee in the Territory. Franchisee agrees to take all steps required by TPR to remit any such ecommerce revenues to TPR.

## 3. SITE SELECTION; START-UP

3.1. <u>Site Standards</u>. Franchisee shall have sole responsibility for the selection of Sites in the Territory. If TPR provides any advice or assistance regarding a Site, such assistance shall not be construed as a representation or guarantee by TPR that the Site or the Franchised Business will be profitable or successful. Franchisee shall notify TPR of each Site chosen by Franchisee and shall submit such information concerning the Site as TPR may request from time to time. Each Site must present a professional, clean image and must

conform to the interior design, trade dress, appearance, furnishings, and aesthetic standards set forth in the Book of Standards from time to time. TPR shall be entitled to visit and inspect all Sites and to interview Franchisee's employees and students to evaluate compliance by Franchisee with this Agreement and the Book of Standards.

3.2. <u>Start-Up Deadline</u>. Franchisee shall begin conducting one or more Authorized Courses at a Site in the Territory no later than the Start-Up Deadline. Failure by Franchisee to begin conducting Authorized Courses in the Territory by the Start-Up Deadline shall constitute a material breach of this Agreement, permitting TPR to terminate this Agreement by giving Franchisee written notice of termination and sixty (60) days to cure the breach. If Franchisee fails to cure the breach within the 60-day period, this Agreement will terminate at the end of the period without further notice or any refund or liability of TPR to Franchisee. If this Agreement is being signed in connection with the renewal or transfer of an existing franchise, the Start-Up Deadline does not apply.

4. **TRAINING PROGRAMS AND MEETINGS**

4.1. <u>Management Training</u>. Before Franchisee begins operations, TPR shall conduct at a location in the United States designated by TPR a management training program for Franchisee covering the TPR Method (as it pertains to Live Test Prep), the Authorized Courses, and the Authorized Services. Franchisee shall cause such personnel as may be designated by TPR to attend management training as provided in this Section. If, during the management training program or within fifteen (15) days thereafter, TPR concludes in its sole discretion that Franchisee or its personnel have not exhibited the aptitude, abilities, or personal characteristics necessary or desirable to operate successfully a Live Test Prep business in accordance with the standards and procedures of the TPR Method and as a franchisee of TPR, TPR may cancel this Agreement and all rights hereunder by giving written notice to Franchisee and tendering a full refund of any amount paid toward satisfaction of the initial franchise fee. Franchisee agrees that: (i) such refund shall be the full extent of TPR's liability and responsibility in the event of such cancellation; (ii) upon cancellation, Franchisee shall return to TPR all proprietary materials, manuals, and information that Franchisee received from TPR, including all copies thereof and notes thereon; and (iii) as a condition of receiving the refund, Franchisee shall execute a general release of claims against TPR, its affiliates, and their respective officers, directors, employees, and owners.

4.2. <u>Teacher Training</u>. Franchisee shall ensure that all individuals who will teach one or more Authorized Courses have been trained in a TPR-certified training program by a TPR-certified teacher trainer before the course begins. TPR will publish its standards and certification procedures for teachers and teacher trainers in the Book of Standards, as modified from time to time. At the conclusion of each training program, Franchisee shall provide TPR with a complete list of attendees, clearly indicating which attendees were and were not certified to teach each specific course.

4.3. <u>Additional Training</u>. TPR shall offer such additional training programs as TPR deems necessary or desirable from time to time. TPR shall have the right to designate additional training programs as mandatory or optional.

4.4. <u>Mandatory Meetings</u>. Franchisee agrees to attend (and, if applicable, to cause employees of Franchisee designated by TPR to attend) any meeting designated by TPR as mandatory. Failure to attend because of bona fide illness or other physical incapacity shall not constitute a default hereunder.

4.5.     Location of Training Programs and Meetings. All training programs and meetings conducted by TPR will be held at a location designated by TPR. If Franchisee's Territory is outside of the U.S., Franchisee shall not be obligated to attend more than one training program per year in the United States.

4.6.     Training and Meeting Expenses. Franchisee shall bear all expenses for travel, lodging, meals and other living expenses incurred by Franchisee's personnel in attending training programs and meetings, whether mandatory or optional. TPR may charge Franchisee: (i) a reasonable fee for each management trainee in excess of four; (ii) a reasonable fee for training requested by Franchisee or offered on an optional basis by TPR; and (iii) a reasonable registration fee for meeting attendees in excess of one.

5.    **FRANCHISEE'S OPERATIONS**

5.1.     Promotion of the Franchised Business. Franchisee agrees, during the term of this Agreement, to promote at all times the sale of Authorized Courses and Authorized Services, using Franchisee's best efforts to develop and enlarge the demand for Live Test Prep in the Territory.

5.2.     Course and Service Offerings. Franchisee shall offer only the Authorized Courses and the Authorized Services. TPR may designate new course programs and services as mandatory or optional. If TPR designates a new course program or service as mandatory, Franchisee agrees to accept and implement the new course program or service within a reasonable time. If TPR designates a new course program or service as optional, TPR may elect to offer the new course program or service to Franchisee on such terms and conditions as TPR may determine. If offered an optional course program or service, Franchisee shall have the right to implement the new course program or service on the terms and conditions specified by TPR. If Franchisee elects not to accept an optional course program or service, TPR shall have the right, notwithstanding Section 2.3, to offer the course program or service in the Territory by any means of TPR's choosing. The list of Authorized Courses and Authorized Services in Appendix A shall be amended from time to time as appropriate to reflect any mandatory or optional new course programs or services implemented by Franchisee. For each optional course program or service, TPR may require Franchisee to pay a new program fee based on TPR's reasonable costs of providing training, developing and producing course materials and marketing materials, and developing and testing equipment specifications for the new program. Franchisee shall not be required to accept more than two (2) mandatory new course programs or services in any calendar year.

5.3.     Compliance with TPR's Standards and Policies. Franchisee acknowledges as an essential condition of this Agreement and the rights granted hereunder that Franchisee must adhere strictly to the TPR Method, as it pertains to Live Test Prep. Franchisee agrees to operate the Franchised Business in accordance with all mandatory methods and procedures prescribed in the Book of Standards, as well as in accordance with TPR's published policies with respect to business hours, student transfers, student refunds, refresher courses, etc., all as revised from time to time by TPR in its reasonable business judgment.

5.4.     Equipment and Computer System. Franchisee agrees to equip the Franchised Business in accordance with the requirements prescribed in the Book of Standards, as modified from time to time. Franchisee shall acquire and install hardware and software that complies with Appendix C to this Agreement, as modified from time to time by TPR in its sole

discretion. Franchisee shall acquire and install such updates and upgrades to hardware and software as TPR may reasonably direct from time to time, at Franchisee's own expense.

5.5. <u>Management Responsibility</u>. At all times during the term of this Agreement, the Franchised Business shall be under the direct, on-site management of the Managing Director, who shall have authority to act on behalf of Franchisee in all dealings with TPR. The initial Managing Director is named in Appendix A. Franchisee may change the Managing Director only with TPR's prior written approval. If the Managing Director's association with Franchisee ends for any reason, Franchisee shall obtain TPR's approval of a new Managing Director within thirty (30) days thereafter.

5.6. <u>Performance Standards</u>. Franchisee shall at all times give efficient service to the public in accordance with the performance standards set forth in Appendix D to this Agreement, as modified from time to time by TPR. Franchisee shall adhere to high standards of business ethics, integrity and fair dealing and do nothing which would tend to discredit or in any manner damage the reputation and goodwill of TPR, the Proprietary Marks, the TPR Method, Franchisee, or other franchisees of TPR.

5.7. <u>Assistance With Distance Learning Courses</u>. If requested by TPR, Franchisee agrees to conduct live review sessions in the Territory for students enrolled by TPR in distance learning courses, subject to such terms as TPR may reasonably prescribe from time to time. TPR shall pay Franchisee a reasonable fee per location, per session for each review session and shall provide all student and teacher materials necessary to deliver the review session.

5.8. <u>Compliance With Laws</u>. Franchisee shall conduct the Franchised Business in accordance with all applicable laws and regulations, including but not limited to tax laws, and at its own expense shall obtain and maintain all permits, certificates, and licenses required to engage in the Franchised Business.

6. **COURSE MATERIALS AND ONLINE TOOLS**

6.1. <u>Course Materials</u>. Franchisee shall use in each Authorized Course only the course materials approved by TPR from time to time as the current, authentic materials for that course. Except for course materials which must be obtained directly from the relevant testing agencies, Franchisee shall purchase all of its Basket of Goods requirements from TPR's affiliates or other sources designated by TPR, on such prices, terms and conditions as the designated suppliers may establish from time to time. Franchisee acknowledges receipt of the Basket of Goods price list that is in effect as of the date of this Agreement. TPR has the right at any time upon reasonable notice to revise the list of items included in the Basket of Goods.

6.2. <u>Online Tools</u>. TPR shall make available to Franchisee, and Franchisee shall make available to Franchisee's students, access to TPR's Online Tools relating to the Authorized Courses. TPR shall have the right to prescribe terms and conditions for access to Online Tools and to revise such terms and conditions from time to time, including but not limited to the Online Tools fees referred to in Section 8.4 below. TPR may also require that Franchisee contract with an affiliate, franchisee, or independent third party of TPR's choosing for Web hosting services through which the Online Tools will be delivered. Franchisee agrees that it will permit access to Online Tools only by individuals who are enrolled in, or who have expressed an intention to enroll in, the Authorized Courses. TPR shall have no obligation to permit access to Online Tools by any student for whom Franchisee is delinquent in payment of any royalty-service fees, transfer fees, or any other applicable fees. TPR shall have the right to exclude any

non-U.S. franchisee from the obligation to provide Online Tools and to pay the Online Tools fees if TPR determines that access cannot feasibly be provided without undue expense or commitment of labor or other resources by TPR.

      6.3.   <u>Translation of Materials and/or Agreement</u>.

          (a)   TPR shall have no obligation to provide any materials or software in any language other than English, or to state any monetary amounts in such materials in any currency other than U.S. dollars. TPR shall have no obligation to provide any software to run on operating systems other than U.S.-based operating systems.

          (b)   Franchisee shall not translate or modify the Book of Standards or any other materials associated with the TPR Method (including, without limitation, signs, course materials, workbooks, software programs, enrollment forms and agreements, promotional materials, and advertising materials) without the prior written consent of TPR. Any such translations or modifications shall be prepared at the sole expense of Franchisee. Before using any translated or modified materials or furnishing such materials to any other person or entity, Franchisee shall submit such materials to TPR for TPR's approval. Approval will be deemed to have been given if TPR has not objected within forty-five (45) days following TPR's receipt of the materials. Any copyrights in translated materials shall be deemed owned exclusively by TPR pursuant to Section 10.5 below.

          (c)   If the parties desire to execute a counterpart of this Agreement in a language other than English, for any purpose, then: (i) Franchisee shall arrange for the translation at Franchisee's expense; (ii) neither party shall have any obligation to execute the counterpart until such time as both parties have approved the translation as accurate and complete; and (iii) except as otherwise required by applicable law, the original English version shall prevail in the event of any conflict between the original English version and the translation.

## 7. PROMOTION AND ADVERTISING

      7.1.   <u>Use of Advertising-Promotion Fees</u>. TPR shall use the advertising-promotion fees collected from Franchisee under Section 8.3 below, together with the advertising-promotion fees collected from other U.S. franchisees, for the development, placement, and distribution of advertising and promotion designed in TPR's discretion to enhance consumer demand for Live Test Prep courses and services.

      7.1.1   TPR shall deposit and hold all unexpended advertising-promotion fees (and any interest thereon) in an appropriately identified bank account (the "Fund") separate and distinct from any other funds of TPR and its affiliates. TPR shall have the right to direct all activities financed by the Fund, with final discretion over strategic direction, creative concepts, materials and endorsements used therein, and the geographic, market, and media placement and allocation thereof. Franchisee acknowledges and agrees that the Fund may be used to pay various costs and expenses as TPR may determine in its sole discretion, including, but not limited to, preparation and production of video, audio, written, and online advertising materials; sponsorship of sporting, charitable, educational, or similar events; design, development, and maintenance of Web sites; reasonable salaries and expenses of TPR employees who perform work for or on behalf of the Fund; reasonable costs and overhead related to the administration of the Fund, including the collection of advertising-promotion fees; implementation of advertising programs, including purchasing direct mail and other media services; employing advertising and public relations agencies; and conducting market research, consumer research, test marketing

and similar activities. Within 90 days after the end of TPR's fiscal year, TPR shall make available to Franchisee, upon request, a report of the receipts and expenditures of the Fund for the previous year.

       7.1.2. If Franchisee's Territory is outside of the United States, Franchisee has no obligation to contribute to the Fund. In light of that fact, Franchisee agrees that it would be unfair to permit Franchisee access to the advertising-promotion materials financed by the Fund on the same terms as contributing franchisees. Accordingly, TPR may deny Franchisee access to materials financed by the Fund or may require Franchisee to pay a surcharge above the price paid for such materials by contributing franchisees, reflecting an equitable portion of the development and production cost of such materials, as reasonably determined by TPR.

      7.2.   **Required Advertising Expenditure**. In addition to contributing to the Fund, Franchisee shall spend annually for advertising and promotion of the Franchised Business an amount equivalent to not less than eight percent (8%) of Franchisee's annual Gross Receipts. If Franchisee's Territory is outside of the United States, Franchisee shall spend annually for advertising and promotion of the Franchised Business an amount equivalent to not less than ten percent (10%) of Franchisee's annual Gross Receipts. At TPR's request, Franchisee shall furnish appropriate documentation verifying Franchisee's expenditure of the minimum amount required hereunder. In addition, the annual income and expense statement referred to in Section 9.3 below shall include a specific line for advertising and promotion expense.

      7.3.   **Participation in Programs**. Franchisee agrees to participate in all advertising, marketing, promotions, research, and public relations programs that TPR designates as mandatory, including reasonable discounting programs to the extent TPR is legally permitted to mandate such programs, whether or not the program is paid for by the Fund. Expenses incurred by Franchisee to participate in such programs shall count toward the minimum required advertising expenditure under Section 7.2. Discounts, however, shall not count towards the minimum required advertising expenditure.

      7.4.   **Approval of Franchisee's Materials**. All promotional materials and advertising that Franchisee develops or proposes to use for the Franchised Business (including web sites) shall, prior to use or publication, be submitted to and approved by TPR in the interest of maintaining the integrity, force, quality, image and goodwill associated with the Proprietary Marks and the TPR Method. Unless TPR disapproves of such proposed promotional materials and/or advertising within seven (7) Business Days following the receipt thereof, approval shall be deemed to have been given.

      7.5   **Website**. Franchisee acknowledges that any website for the Franchised Business constitutes advertising and promotion subject to Section 7.4 above. In addition to the approval requirement in Section 7.4, Franchisee agrees to comply with all standards and procedures issued by TPR from time to time with respect to franchisee websites, including but not limited to the following:

      7.5.1 The URL (domain name) for the website must be registered in TPR's name as owner, and all links to other websites must be approved in writing by TPR.

      7.5.2 Franchisee's website shall be used solely for the advertising and promotion of Authorized Courses and Authorized Services offered at the Sites. Except as expressly authorized by TPR, Franchisee shall not distribute, deliver, or make available any products or services associated with TPR via the Internet or any other computer network.

7.5.3   Franchisee shall implement reasonable network security measures, consistent with industry "best practices," to prevent access to student data or other confidential data by any unauthorized person.

7.5.4   Franchisee agrees that the copyright in any website for the Franchised Business shall be deemed to be owned solely by TPR, and Franchisee agrees to execute any documents that TPR reasonably deems necessary to affirm TPR's ownership of the copyright. Franchisee shall cause any website service provider or hosting company with which Franchisee does business to cooperate with TPR with respect to TPR's interests in the website, including but not limited to furnishing an acknowledgment of TPR's ownership of the copyright.

7.5.5   Franchisee represents to TPR that Franchisee has or will have the lawful right to use any trademarks, images, copyrighted text, or other proprietary materials that may appear in any website for the Franchised Business.

7.5.6   TPR shall have the right at any time, on reasonable notice, to require that the website for the Franchised Business reside on one or more pages within TPR's website and be accessible only by link from TPR's website.  If TPR invokes this right, Franchisee agrees to close down any non-TPR hosted website for the Franchised Business within 30 days after the linked pages on TPR's site are operational.

## 8.   FEES

8.1.   <u>Franchise Fee</u>.  Franchisee shall pay to TPR upon execution of this Agreement a franchise fee in the amount shown in Appendix A.  Any deposit toward the franchise fee received by TPR from Franchisee before execution of this Agreement shall become non-refundable upon execution of this Agreement and shall be credited to the franchise fee.  If this Agreement is being signed in connection with the renewal of an existing franchise, the franchise fee shall be the amount of the renewal fee specified in the existing franchise agreement.

8.2.   <u>Royalty-Service Fee</u>.  Franchisee shall pay to TPR during the term of this Agreement a royalty-service fee equal to eight percent (8%) of Franchisee's Gross Receipts.

8.3.   <u>Advertising-Promotion Fee</u>.  If Franchisee's Territory is in the United States, Franchisee shall pay to TPR during the term of this Agreement an advertising-promotion fee equal to two percent (2%) of Franchisee's Gross Receipts.  The advertising-promotion fee does not apply to non-U.S. franchises.

8.4.   <u>Online Tools Fee</u>.  Franchisee shall pay to TPR (or its designee under Section 6.2 above) the Online Tools fees established by TPR for various Online Tools.  For convenience, the Online Tools fees shall be calculated based on the number of students enrolled by Franchisee in each Authorized Course at any time during the period covered by the statement or invoice issued by TPR under Section 8.7.  TPR may increase the Online Tools fees from time to time in its discretion, provided that:  (i) TPR gives reasonable notice of the increase; (ii) the increase is uniform for all similarly-situated franchises; and (iii) the fee may not be increased more often than once per calendar year.

8.5.   <u>Student Transfer Fee</u>.  Franchisee shall pay to TPR or to the appropriate franchisee of TPR, in accordance with TPR's Inter-Franchise Transfer Policy, as amended from time to time by TPR, a transfer fee for each student who transfers to another site from a Site

operated by Franchisee. The student transfer fee does not apply to a transfer between non-U.S. franchises.

8.6    Minimum Royalty. Franchisee agrees that the aggregate royalty-service fees and advertising-promotion fees each calendar year shall be not less than: (a) 110% of the aggregate royalty-service fees and advertising-promotion fees payable by Franchisee based on Gross Receipts for the preceding calendar year, or (b) one-half of the franchise fee originally paid by Franchisee for the right to operate the Franchised Business, whichever of (a) or (b) is greater (the "Minimum Royalty").

8.7.    Payment Method and Due Date. Except as otherwise provided in Section 8.8 below, all payments by Franchisee shall be made by electronic debit, wire transfer, or such other method as TPR designates from time to time. Franchisee shall furnish such bank authorizations or other authorizations as may be necessary to achieve payment by the method designated by TPR. Royalty-service fees and advertising-promotion fees must be received by TPR by the tenth (10th) day of each calendar month, based on Gross Receipts for the preceding calendar month. Except as otherwise provided in this Agreement, all other fees and payments due from Franchisee to TPR and its affiliates (including, but not limited to, Online Tools fees and student transfer fees) must be received by TPR within 30 days after Franchisee's receipt of the invoice or statement for such fees and charges. All fees and payments must be accompanied by documentation clearly designating the obligation(s) for which the payment is being made.

8.8.    Reserve Requirement.

8.8.1    Unless Section 8.8.4 applies, starting with the first full calendar year after the Opening Date, Franchisee shall prepay royalty-service fees and advertising-promotion fees to TPR quarterly. Unless Franchisee is relieved of this requirement under Section 8.8.3 below, the quarterly payments shall be due by January 15th for the first quarter of the calendar year, by April 15th for the second quarter, by July 15th for the third quarter, and by October 15th for the fourth quarter. Each quarterly prepayment shall be 25% of the Minimum Royalty amount for that calendar year, as defined in Section 8.6.

8.8.2    While the Reserve requirement is in effect, TPR will deduct Franchisee's royalty-service fees and advertising-promotion fees from the Reserve. If accrued royalty-service fees and advertising-promotion fees during a calendar quarter do not exhaust the Reserve balance on hand for that calendar quarter, TPR will retain the Reserve balance at the end of the calendar quarter, to be applied to royalty-service fees and advertising-promotion fees in future quarters of the same calendar year. If accrued royalty-service fees and advertising-promotion fees during a calendar quarter exceed the Reserve balance on hand during that calendar quarter, Franchisee shall pay the excess to TPR as provided in Section 8.7, and such excess shall reduce the amount required to be paid into the Reserve for the next quarter of the same calendar year. However, if such an excess occurs in the last quarter of the calendar year, it will not affect the amount of the Reserve for the following calendar year, as determined under Section 8.8.1. TPR shall retain any Reserve balance remaining on hand at the end of the calendar year and credit the balance toward the Minimum Royalty in Section 8.6.

8.8.3    Franchisee may request TPR in writing to be relieved of the Reserve requirement, provided that: (i) Franchisee has complied with the Reserve requirement for at least twelve (12) consecutive calendar quarters; (ii) Franchisee has not otherwise been in material default of this Agreement; and (iii) the Minimum Royalty for both the current calendar

year and the previous calendar year was required to be determined using the method in clause (a) of Section 8.6. If Franchisee satisfies the conditions in clauses (i)-(iii), TPR shall not unreasonably refuse Franchisee's request. TPR shall have the right to reinstate the Reserve requirement if Franchisee is at any time in material default of its obligations under this Agreement or in the event of any late payment by Franchisee to TPR or its affiliates.

       8.8.4   If this Agreement is being signed in connection with the renewal of an existing franchise, the Reserve requirement does not apply.

      8.9.   <u>Delinquency</u>. If any royalty-service fees or other amounts owed to TPR or its affiliates by Franchisee are not paid in full by the due date, TPR or its affiliates will have the right to charge a fee equal to 10% of the overdue amount to reimburse TPR for its administrative costs related to the delinquency. In addition, the overdue amount shall bear interest at the annual rate of eighteen percent (18%) (or the maximum rate permitted by applicable law, if less than 18%) from the date such amount was due until paid in full. Unpaid interest charges shall be compounded annually.

      8.10.   <u>Taxes</u>. Franchisee shall promptly pay when due all taxes levied or assessed on Franchisee in connection with the Franchised Business. In addition, Franchisee shall pay to TPR an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on TPR with respect to any payments that TPR receives from Franchisee under this Agreement.

## 9.   REPORTS AND RECORDS

      9.1.   <u>Books and Records</u>. Franchisee shall maintain financial records in accordance with generally accepted accounting principles ("GAAP") in the Territory and shall maintain other business records in accordance with the requirements set forth in the Book of Standards from time to time. If TPR has not established specific requirements for other business records, Franchisee shall maintain them in such a manner as to clearly and accurately reflect all operations of the Franchised Business. If GAAP in the Territory differ from U.S. GAAP, TPR may require that any financial data or reports requested from Franchisee be accompanied by a reconciliation to U.S. GAAP.

      9.2   <u>Monthly Statement of Gross Receipts</u>. Franchisee shall submit to TPR by the tenth (10th) of each month an accurate and complete statement of Gross Receipts for the preceding calendar month.

      9.3.   <u>Quarterly Financial Statements</u>. Within thirty days after the end of each quarter of Franchisee's fiscal year, Franchisee shall submit to TPR a statement of financial condition (a balance sheet) as of the end of such fiscal quarter and a statement of income and expenses relating to the Franchised Business for such fiscal quarter and for the fiscal year-to-date. The financial statements shall be: (i) submitted on forms specified, approved or provided by TPR; (ii) completed according to their terms in accordance with generally accepted accounting practices in the Territory; and (iii) certified as correct and complete by Franchisee or its chief financial officer. For purposes of this Agreement, Franchisee's fiscal year shall begin on the first day of January and end on the 31st day of December, unless changed with the written consent of TPR.

      9.4.   <u>Parent and Guarantor Financial Statements</u>. At TPR's request, Franchisee shall furnish to TPR a statement of financial condition as of the end of the fiscal quarter and a year-

to-date statement of income and expenses for each individual or corporate guarantor of Franchisee's obligations to TPR and, if applicable, for each of Franchisee's direct and indirect corporate parents.

9.5. <u>Right to Examine or Audit</u>. TPR shall be entitled: (i) upon reasonable notice, to require Franchisee to engage an independent accounting firm, at Franchisee's expense, to review or audit any financial statements submitted to TPR under Section 9.3 or Section 9.4; (ii) upon seventy-two hours notice, to examine or audit Franchisee's books and records at Franchisee's offices, using any combination of TPR's own personnel and/or outside service providers; and (iii) upon ten Business Days notice, to require Franchisee to assemble, copy and deliver financial statements, books and records to TPR for examination or audit at TPR's offices. If the Territory is outside of the U.S., the accounting firm in clause (i) must be one of recognized international standing. In any such examination or audit, English-language versions of all books, records, accounts, correspondence, data, financial statements required by Sections 9.3 and 9.4, and tax returns related to the Franchised Business shall be made available for inspection by TPR or its duly authorized representatives. Franchisee shall cooperate fully with the persons making such examination or audit on behalf of TPR. If Franchisee or TPR discovers at any time, by means of an audit or otherwise, that there has been an underpayment of royalty-service fees or other fees or charges by Franchisee, Franchisee shall pay the amount due to TPR and/or its affiliates, together with all late fees and interest due under Section 8.9 above. Payment and acceptance of such amounts shall not constitute a waiver by, or prejudice any right of, TPR to exercise any other remedy of this Agreement, including termination in accordance with Section 16.1.9 of this Agreement.

9.6. <u>Cost of Examination or Audit</u>. If an examination or audit is performed due to (i) Franchisee's failure to submit required statements of Gross Receipts, or (ii) Franchisee's failure to maintain books and records as provided herein, or if the cumulative Gross Receipts reported by Franchisee for any period of six consecutive months is more than five percent (5%) below the actual Gross Receipts for such period as determined by the examination or audit, then Franchisee shall pay to TPR the reasonable and customary cost of the examination or audit, including travel and lodging expenses for the examiners or auditors. For purposes of calculating the reasonable and customary cost, TPR shall use hourly rates for its own personnel that are commensurate with the rates of mid-level professionals of independent accounting firms.

9.7. <u>Reports; Electronic Access</u>. Franchisee shall submit such reports and records as may be required by TPR from time to time, in the form and using the method(s) specified by TPR, including but not limited to all data concerning enrolled and prospective students. Franchisee shall at all times maintain a connection to TPR's network with a capacity consistent with that of franchisees of similar size in terms of number of enrolled students. TPR shall have the right at any time to access Franchisee's system and to copy or download data relating to the Franchised Business. If Franchisee is connected electronically to TPR's "Yonkers" system (or any successor system that may be established by TPR), inputting all required data into Yonkers shall be deemed to satisfy Franchisee's reporting obligation with respect to student and prospect information.

9.8. <u>Delinquent Reports</u>. If TPR requires that a certain type of report or information under Sections 9.2, 9.3 or 9.7 accompany a specified payment or type of payment, and the required report or information does not, in fact, accompany the payment, the payment shall be deemed overdue until such time as TPR has received the required report or information, and the administrative fee and interest shall be chargeable as provided in Section 8.9.

9.9. <u>Ownership of Data</u>. Franchisee agrees that all data that Franchisee collects from students or others in connection with the Franchised Business is deemed to be owned exclusively by TPR and its affiliates. Franchisee shall not sell or disclose to anyone else the identities of, or provide any information concerning, any students or prospects without first obtaining the written consent of TPR. Franchisee has the right to use this data only in the Franchised Business while this Agreement is in effect. In the event of an approved sale of Franchisee or of the Franchised Business to a new owner who will continue to operate the Franchised Business, Franchisee may transfer the data to the buyer as part of the going concern value of the Franchised Business.

**10. PROPRIETARY MARKS AND MATERIALS**

10.1. <u>Identification of Franchised Business</u>. Franchisee shall operate, advertise, and promote the Franchised Business, the Authorized Courses, and the Authorized Services only under the Proprietary Marks listed in Appendix B. Franchisee shall not use a local language version of any of the Proprietary Marks or other local-language trade name without the explicit prior written approval of TPR. In conjunction with any use of the Proprietary Marks, Franchisee shall identify itself to the public as an independent franchisee operating under authority of this Agreement. Franchisee shall not, however, use the words THE PRINCETON REVIEW or any other of the Proprietary Marks in or as part of the legal name or corporate name of Franchisee.

10.2. <u>Validity and Use</u>.

10.2.1. Franchisee acknowledges that, as between the parties hereto, the Proprietary Marks are solely the property of TPR. Franchisee agrees to use the Proprietary Marks only for so long as this Agreement remains in force, only in connection with the Franchised Business, and only in compliance with applicable law in the Territory and any guidelines and bulletins issued by TPR relating to the proper use of the Proprietary Marks. All rights, benefits and goodwill that may develop in the Proprietary Marks shall inure exclusively to TPR's benefit.

10.2.2. Franchisee shall not, either during or after the term of this Agreement, do anything, or aid or assist any other party to do anything, which would infringe upon, harm, dilute or contest the rights of TPR in any of the Proprietary Marks or in any other mark or name which incorporates the name "The Princeton Review" or "TPR."

10.2.3. Franchisee acknowledges that: (i) the Proprietary Marks are valid; (ii) Appendix B shows the registration status in the Territory, as of the date of this Agreement, of the marks "The Princeton Review" and "The Princeton Review & Design"; (iii) TPR has no obligation under this Agreement to seek registration of any Proprietary Mark in the Territory; and (iv) registration is not assured with respect to any Proprietary Mark for which TPR has filed or may file an application for trademark registration in the Territory. Franchisee shall assist TPR as reasonably requested in connection with any trademark or service mark applications filed by TPR in the Territory for the Proprietary Marks. Franchisee agrees that TPR shall have no liability to Franchisee on account of a failure or refusal by trademark authorities in the Territory to register any of the Proprietary Marks, and that this Agreement shall remain in full force and effect notwithstanding any such failure or refusal to register.

10.2.4. Franchisee shall not register, or apply for registration of, any trademark, copyright, or patent directly or indirectly relating to the TPR Method, anywhere in the world, without TPR's prior written consent. Any such registration or application by Franchisee, whether

or not authorized by TPR, shall be deemed to be owned by TPR and Franchisee shall take such steps, including execution of an assigment, as TPR may reasonably request to confirm TPR's ownership. Franchisee shall bear the cost of any such registration or application in the Territory, whether undertaken by Franchisee or by TPR, including but not limited to the cost of any clearance searches, filing fees, legal fees, opposition or cancellation proceedings, appeals, settlements, assignments, and renewals. If the registration or application is undertaken by TPR, TPR shall provide Franchisee from time to time with a statement of the costs incurred by TPR, and Franchisee shall reimburse TPR within 30 days after receipt of each statement.

    10.2.5.  If required by law in Franchisee's Territory or if requested by TPR, Franchisee shall take such steps as may be necessary, at Franchisee's expense, to record Franchisee as a licensed user of the Proprietary Marks at the appropriate government office or registry in the Territory. At TPR's request, TPR and Franchisee shall execute a short-form trademark license for recording purposes. TPR shall have the right to cancel such registration and short-form trademark license upon expiration or termination of this Agreement by either party for any reason, or if TPR determines that such cancellation is otherwise necessary or desirable. Franchisee agrees not to contest cancellation by TPR of any registration of Franchisee as a registered user.

    10.3.  <u>Unauthorized Use by Others</u>.  Franchisee shall promptly report to TPR any unauthorized use of the Proprietary Marks, of any confusingly similar mark, or of the TPR Method that comes to Franchisee's attention. TPR shall consult with Franchisee, but TPR shall have the final decision as to what action, if any, to take regarding the matter. If requested by TPR, Franchisee agrees to cooperate with TPR in stopping and/or preventing such unauthorized use. If TPR takes action against such unauthorized use in response to a specific request by Franchisee, Franchisee agrees to share equally any costs incurred by TPR in that regard, including but not limited to the cost of investigators, legal fees, filing fees, court costs, arbitration expenses, appeals, and settlements. If TPR takes action against such unauthorized use at TPR's own initiative, TPR will be responsible for any costs incurred.

    10.4.  <u>Defense of Alleged Infringement</u>.  If any action or claim is filed or threatened against Franchisee based on allegations that Franchisee's use of any Proprietary Mark or materials provided to Franchisee by TPR for use in the Franchised Business infringes the rights of others, TPR shall defend the suit or action and shall indemnify Franchisee for all damages awarded, provided that Franchisee's use of the Proprietary Marks and materials was in compliance with this Agreement and that Franchisee gives TPR immediate notice and reasonably cooperates in the defense. TPR shall have the sole right to control the defense of, and the sole discretion to compromise and settle, any such suit or action. If TPR determines that Franchisee's use of the Proprietary Marks or materials was not in compliance with this Agreement, Franchisee shall reimburse TPR for all damages and expenses incurred by TPR to defend the matter.

    10.5.  <u>Changes to Proprietary Marks</u>.  TPR reserves the right to modify, add to, substitute for, or delete from the Proprietary Marks in TPR's discretion. Franchisee shall promptly implement any such changes as directed by TPR, at Franchisee's expense.

    10.6.  <u>Copyrights</u>.  Franchisee acknowledges that TPR is the owner of any and all copyrights in the materials developed for or used in connection with the TPR Method, regardless of who created the materials or the language in which they appear (the "Works"). Franchisee undertakes that it shall not, during or after the term of this Agreement: (a) dispute ownership by TPR of all copyrights in the Works; (b) challenge the validity of any copyrights in

the Works; or (c) do anything by itself or aid, abet or assist others to perform acts which would infringe on the copyrights in the Works. At TPR's request, Franchisee shall deliver all materials created or developed by Franchisee to TPR in a mutually-agreed electronic format.

11. **CONFIDENTIAL INFORMATION**

Franchisee acknowledges that all Confidential Information is revealed to Franchisee in trust and in confidence, solely for the purpose of enabling Franchisee to establish and operate the Franchised Business. Franchisee agrees not to copy or reproduce any Confidential Information without TPR's prior written consent or reveal any Confidential Information to any other person or firm, except to employees of Franchisee while this Agreement is in effect, and then only in confidence and only to the extent necessary for them to perform the duties of their employment. Franchisee agrees further that it will not use any Confidential Information in any manner other than in connection with the operation of the Franchised Business while this Agreement is in effect. Franchisee shall obtain written confidentiality undertakings from its personnel as provided in Section 13.3 below. Franchisee acknowledges and agrees that its obligations in this Section 11: (i) are of particular importance in view of the fact that The Princeton Review, Inc. is a publicly-owned company whose shares trade on the NASDAQ stock market; and (ii) will survive the expiration or termination of this Agreement by either party for any reason.

12. **IMPROVEMENTS TO THE TPR METHOD**

Franchisee acknowledges that only TPR can license rights in and to the TPR Method and any parts thereof, including Live Test Prep. TPR shall provide to Franchisee all improvements and changes to the Authorized Courses and the Authorized Services that TPR circulates generally to other franchisees offering the same courses and services. Franchisee agrees that any idea or suggested innovation or variation that may tend to enhance or improve the efficiency or effectiveness of the Authorized Courses or Authorized Services that Franchisee discovers or otherwise becomes aware of during the term of this Agreement, shall be submitted to TPR for its evaluation for adoption and use by TPR, its affiliates, and other franchisees of TPR. Franchisee agrees that the proprietary rights to such ideas, innovations, or variations shall be deemed assigned to TPR without obligation to pay any compensation to Franchisee. Franchisee further agrees to execute such documents as TPR may reasonably request to confirm TPR's ownership of such proprietary rights.

13. **RESTRICTIONS ON COMPETITION**

13.1 <u>During Term</u>. While this Agreement is in effect, Franchisee shall not directly or indirectly, without TPR's prior written consent:

13.1.1 own, operate, engage in, be employed by, provide assistance to, or have any interest in any business that offers courses similar to the Authorized Courses or offers services similar to the Authorized Services, or competes with TPR in any other line of business, anywhere in the world; or

13.1.2 divert any student or customer, or prospective student or customer, to any competitor of TPR.

13.2    After Termination, Expiration, or Transfer.

13.2.1 For two (2) years after the expiration or termination of this Agreement for any reason, or after an approved transfer of the Franchised Business to a new franchisee, Franchisee shall not, without TPR's prior written consent: (a) own, operate, engage in, be employed by, provide assistance to, or have any interest in any business that offers courses similar to the Authorized Courses in the Territory or offers services similar to the Authorized Services in the Territory; or (b) divert any student or customer, or prospective student or customer, to any competitor of TPR in the Territory.

13.2.2 For one (1) year after the expiration or termination of this Agreement for any reason, or after an approved transfer of the Franchised Business to a new franchisee, Franchisee shall not, without TPR's prior written consent, own, operate, engage in, be employed by, provide assistance to, or have any interest in any business that (i) offers courses similar to the Authorized Courses or offers services similar to the Authorized Services, and (ii) is located within twenty (20) miles of any Live Test Prep business operated by TPR or by any other franchisee of TPR.

13.2.3 If a dispute regarding the enforceability of Section 13.2.1 or 13.2.2 is resolved in TPR's favor, the restriction deemed reasonable by the court or arbitrator will run from the date of the order permitting enforcement of the restriction.

13.3    Personal Obligations of Owners, Etc.  If Franchisee is a corporation or other legal entity, each owner of Franchisee acknowledges that, by signing this Agreement or the Personal Guaranty, such owner is binding himself or herself personally to certain terms and conditions of this Agreement, including but not limited to Sections 11 and 13. Franchisee agrees to obtain from its officers, directors, and employees, as may be directed by TPR, executed agreements similar in substance to Sections 11 and 13 of this Agreement. Such agreements shall be in a form acceptable to TPR and shall specifically identify TPR as a third-party beneficiary with the independent right to enforce such agreement. For each individual, the time periods referred to in Section 13.2 above shall run from the earlier of (i) expiration, termination, or approved transfer of this Agreement, or (ii) the end of such individual's association with Franchisee.

13.4    Indirect Violations Prohibited.  Neither Franchisee nor any person bound by the restrictions of this Section 13 may circumvent such restrictions by engaging in prohibited activity indirectly through any other person or entity.

## 14.    LIMITATIONS ON ASSIGNABILITY BY FRANCHISEE

14.1.    Assignment of Franchise Rights.

14.1.1. The franchise rights granted hereunder are personal to Franchisee. Franchisee agrees not to sell, assign, transfer, convey, or encumber this Agreement or any right or interest therein or thereunder, or substantially all of the assets of the Franchised Business, nor to suffer or permit any such sale, assignment, transfer, conveyance or encumbrance to occur by operation of law, without the prior written consent of TPR. TPR's consent may be withheld on any reasonable grounds. Factors to be considered by TPR in its determination of consent may include, but are not limited to: business experience, reputation, integrity, and personal and financial qualifications of the proposed successor; the management, organizational structure and controlling ownership of a proposed corporate franchisee; understanding and acceptance of the obligations and responsibilities of a THE PRINCETON

REVIEW franchisee; and all other pertinent information reasonably calculated to support a prudent business decision. Among other things, it shall not be unreasonable for TPR to require: (i) that the proposed successor enter into a Franchise Agreement substantially on the terms and conditions then being offered by TPR to new franchisees (or, if franchises are not then being offered to new franchisees, on the terms and conditions most recently offered by TPR); (ii) that any existing defaults by Franchisee be fully cured; and/or (iii) that Franchisee and its owners execute a general release of claims against TPR, its affiliates, and their respective officers, directors, employees, and owners. If TPR requires the transferee to sign the then-current form of THE PRINCETON REVIEW Franchise Agreement: (x) the initial term of the new agreement shall be the remainder of the then-current term of this Agreement; (y) the royalty-service fee percentage and renewal terms and conditions of this Agreement shall carry over to the new agreement during its initial term; and (z) the new agreement shall not impose any new material fees upon the transferee during its initial term.

14.1.2. If Franchisee is a corporation, limited liability company, or other legal entity, any sale, transfer, pledge or distribution of any direct or indirect ownership interest in Franchisee, and any voting trust, management agreement, or other arrangement affecting the power to direct and control the affairs of the Franchised Business, shall require the prior written consent of TPR, as provided in Section 14.1.1 above. Franchisee shall furnish such information and documentation as TPR may request concerning any such proposed transfer or arrangement. If a proposed transfer would result in a change of control of Franchisee or of any parent company of Franchisee, such transfer shall be deemed to be an assignment of this Agreement and TPR may impose, as a condition of giving its consent, any requirement which TPR could impose on an assignment of this Agreement under Section 14.1.1.

14.1.3. For any proposed sale of substantially all of the assets of the Franchised Business or of the stock or other ownership interests in Franchisee or its parent company (or any other transaction that would result in control of the Franchised Business changing to a new owner), Franchisee shall pay TPR a transfer fee of U.S. $25,000 plus the attorney's fees and other expenses that TPR incurs in connection with the transfer (including expenses for TPR's representatives to attend meetings with Franchisee or the proposed transferee concerning the proposed transfer). For any other proposed transfer requiring TPR's approval, TPR may charge Franchisee a transfer fee equal to the attorneys' fees or other expenses incurred by TPR in connection with the transfer, not to exceed $25,000. In all cases, reimbursement of TPR's expenses is required whether or not TPR approves the transfer.

14.2.  TPR's First Option to Acquire.

14.2.1. TPR shall have the first right and option to purchase or acquire any right or interest in this Agreement, in Franchisee, or in the Franchised Business that is proposed to be transferred. Franchisee or the transferring owner shall submit to TPR: (i) a copy of the bona fide written offer from the proposed purchaser, assignee or transferee or other appropriate documentation setting forth all of the terms of the proposed transaction; (ii) detailed financial information for the proposed purchaser, assignee, or transferee and for any proposed guarantor of such person's obligations; and (iii) a detailed biographical statement (including the background of the top-level management and controlling owners of any legal entity). For a period of twenty (20) days after TPR's receipt of such documentation, TPR shall have the right to request from Franchisee additional information concerning the terms of the proposed transaction and/or the proposed principal parties thereto. TPR may assign its right of first refusal before or after exercising such right.

14.2.2. TPR may exercise its right under Section 14.2.1 by notifying Franchisee in writing of its election to do so within twenty (20) days following TPR's receipt of all information requested by TPR under Section 14.2.1 above (the "Option Period"). If the transfer is proposed to be made pursuant to a sale, TPR or its designee may purchase the interest to be transferred on substantially the same financial terms and conditions offered by the third party, except that TPR shall have the right to substitute the reasonable equivalent in U.S. dollars for any other form of consideration offered by the third party. If the transfer is proposed to be made by gift, bequest, or operation of law, TPR shall designate an accounting firm of recognized international standing to act as an independent appraiser at TPR's expense. The appraiser shall determine the fair market value of the interest to be transferred. TPR may purchase such interest at the fair market value determined by the appraiser.

14.2.3. If TPR does not notify Franchisee within the Option Period, then the proposed transfer may be completed subject to TPR's consent as provided in Section 14.1, but only on the terms set forth in the written offer or statement and only to the party therein identified. If the proposed sale, assignment or transfer is not completed within one-hundred twenty (120) days after the expiration of the Option Period, the offer shall be deemed withdrawn or rejected, and the provisions of this Section 14.2 shall renew and again be fully applicable.

14.3. <u>Death or Disability of Franchisee</u>. In the event of the death or disability of Franchisee (or, if Franchisee is a corporation or other legal entity, any person with an ownership interest in Franchisee), TPR will consent to an assignment and transfer of such person's interest on an interim basis to the executor, administrator or personal representative, and subsequently to such person's heir, legatee or devisee, subject to satisfaction of the following conditions:

14.3.1. If the deceased or disabled person was the principal owner or Managing Director of the Franchised Business, TPR shall have the right, but no obligation, to operate the Franchised Business on behalf of and for the benefit of such person's estate pending final disposition of the Franchised Business pursuant to this Agreement. If TPR exercises its right under this Section 14.3.1, TPR shall be entitled to charge a reasonable management fee for its services;

14.3.2 TPR shall have waived the exercise of TPR's right of first refusal under Section 14.2 with respect to the transfer of such person's interest;

14.3.3. It shall be demonstrated to the satisfaction of TPR that the successor is qualified on the basis of character, business experience and capability, credit standing, health, and financial resources to operate the Franchised Business in accordance with the terms of this Agreement;

14.3.4. The person, if any, to be appointed as the new Managing Director shall have been approved by TPR and shall have successfully completed the training courses then in effect for franchisees or shall commit to complete such courses at the next earliest time offered by TPR. The transferee shall pay TPR's then-current training fee and bear all travel and living expenses incurred in attending training;

14.3.5. There shall be no existing default in any of the obligations of Franchisee which would constitute cause for termination pursuant to Section 17 hereunder, and all amounts owed to TPR and its affiliates shall be paid in full; and

14.3.6. The executor, administrator, personal representative or successor: (i) shall have submitted evidence satisfactory to TPR that he or she has become entitled to succeed to the interests of the deceased or incapacitated individual; (ii) shall agree to be bound by all the terms and provisions of this Agreement to the same extent and manner as such individual; and (iii) shall execute such personal undertakings as TPR shall reasonably require.

14.4. <u>Effect of Consent</u>. TPR's consent to a transfer hereunder shall not constitute consent to any subsequent assignment or transfer or a waiver of any existing default or obligation of the transferor.

## 15. ASSIGNABILITY BY TPR

TPR has the right to assign this Agreement or any of TPR's rights hereunder, or to delegate to others the performance of some or all of TPR's obligations to Franchisee. Franchisee agrees that TPR and its affiliates will have no liability for performance hereunder after the effective date of TPR's assignment of this Agreement.

## 16. RENEWAL

16.1 Except as otherwise provided in Section 16.2, Franchisee shall have the option to renew the rights granted herein for two (2) additional terms of five (5) years each, provided that all of the following conditions have been fulfilled:

16.1.1 Franchisee must give written notice to TPR of Franchisee's intention to renew no later than sixty (60) days, and no earlier than one hundred eighty (180) days, before the end of the expiring term;

16.1.2 At the time of giving notice of intention to renew and at the scheduled date of renewal, there must be no pending, uncured default of this Agreement by Franchisee, and Franchisee must have a satisfactory record of customer service and compliance with this Agreement during the expiring term;

16.1.3 Franchisee must execute, no later than thirty (30) days before the end of the expiring term, a renewal agreement based substantially on the standard franchise agreement terms and conditions then being offered by TPR to new franchisees (or, if TPR is not then offering franchises to new franchisees, on the standard franchise agreement terms and conditions that TPR has most recently offered). The standard franchise agreement will be modified to replace the franchise fee with the renewal fee in Section 16.1.4 below, to delete other items inapplicable to the renewal term (such as initial training), and, in the case of the second five-year renewal term, to state that there is no further right of renewal. The term of the renewal agreement will start on the day after the end of the expiring term and end five years from that date.

16.1.4 Franchisee must pay TPR a renewal fee equal to twenty percent (20%) of the franchise fee originally paid by Franchisee to become a franchisee of TPR. In addition, Franchisee shall reimburse TPR for any expenses incurred by TPR in connection with the renewal, including attorneys' fees and travel costs for TPR's representatives to meet with Franchise and to review Franchisee's operations;

16.1.5 Franchisee must execute a general release of claims against TPR, its affiliates, and their respective officers, directors, employees, and owners; and

16.1.6 If Franchisee's Territory is outside of the U.S., Franchisee must obtain any government approvals that may be required in connection with the renewal.

16.2   If this Agreement is being signed in connection with the renewal or transfer of an existing franchise, Franchise shall have such further renewal periods, if any, as Franchise would have had if the prior Franchise Agreement continued in effect. However, the renewal conditions in Section 16.1 above shall supersede the renewal conditions of the prior Franchise Agreement.

**17.   TERMINATION**

17.1.   <u>Termination by TPR for Cause</u>.  In addition to its other rights to terminate this Agreement, TPR may terminate this Agreement if any of the following conditions occurs, by giving Franchisee written notice of termination.  If applicable law requires a longer period of notice or opportunity to cure than set forth in this Section 17, the period of time stated in this Section shall be deemed amended to conform with such applicable law:

17.1.1. Franchisee fails to make any payment of money owed to TPR or its affiliates when due, or fails to submit to TPR when due any report required pursuant to this Agreement, and the default is not fully cured within fifteen (15) days after TPR gives notice of the default to Franchisee;

17.1.2. Franchisee or its principal owner is declared or becomes insolvent or bankrupt or makes an assignment for the benefit of creditors, or a receiver is appointed for Franchisee's or its principal owner's assets or business, or a proceeding is commenced by or against Franchisee or its principal owner for appointment of a receiver or for a reorganization or similar arrangement under any applicable law and, if involuntary, such proceeding is not dismissed within sixty (60) days of the filing thereof;

17.1.3. Franchisee or any direct or indirect owner of Franchisee transfers any interest except in accordance with the terms of Section 14;

17.1.4. Subject to Section 14.3 of this Agreement, Franchisee becomes unable to perform the obligations required or contemplated hereunder for a period of more than thirty (30) days;

17.1.5. Franchisee conducts no Authorized Courses during any consecutive six (6) month period after the Opening Date;

17.1.6. Franchisee or any officer, director, or direct or indirect owner of Franchisee:  (i) jeopardizes the goodwill of the Proprietary Marks, the TPR Method, or the reputation of TPR; (ii) commits any act which is contrary to general standards of decency, morality, or business integrity; or (iii) pleads guilty to or is convicted of a crime which, in TPR's sole judgment, may adversely affect the reputation of Franchisee, the Franchised Business, TPR, or the TPR Method;

17.1.7. Franchisee fails to protect Confidential Information as required by Section 11 of this Agreement;

        17.1.8. Franchisee refuses to permit an inspection of Franchisee's Sites or an examination or audit of any of the books, records, or financial statements under Section 3.1 and Section 9.5 of this Agreement;

        17.1.9. Franchisee makes any material misrepresentation to TPR in connection with the application for the franchise, or at any time submits any report or statement which Franchisee knows or should know to be false or misleading;

        17.1.10.   Franchisee fails to conduct its business in accordance with applicable laws and regulations. This shall not prevent Franchisee from contesting in good faith the validity or applicability of any purported legal obligation to the extent and in the manner permitted by law;

        17.1.11.   Franchisee fails to comply with any material provision of this Agreement not otherwise specifically referred to in this Section 17.1, including failure to comply with any mandatory component of the Book of Standards, and such default is not cured to TPR's satisfaction within thirty (30) days after TPR gives written notice of default to Franchisee; or

        17.1.12.   Franchisee receives three or more notices of default hereunder within any two-year period. Upon the third notice of default, TPR need not provide an opportunity to cure even if such default is of the type for which a cure period otherwise would apply.

    17.2   <u>Cross-Default</u>. Any default by Franchisee under any other agreement with TPR or its affiliates will constitute a default under this Agreement, subject to the same provisions for notice and cure, if any, as may be applicable to the default under the other agreement.

**18.   OBLIGATIONS UPON EXPIRATION OR TERMINATION**

    Upon termination, expiration, or cancellation of this Agreement for any reason or in any manner, Franchisee shall cease to be an authorized THE PRINCETON REVIEW franchisee, and Franchisee shall:

    18.1.   <u>De-identification</u>. Immediately discontinue the use of the TPR Method in its entirety, all Proprietary Marks, and any names, marks or signs which may be confusingly similar thereto, and all other materials which may indicate that Franchisee is or was a franchisee of TPR or otherwise associated with TPR. Franchisee shall not promote itself as a former franchisee of TPR. Franchisee shall promptly return to TPR all copies, past and present, of the Book of Standards and all other proprietary materials of TPR. Franchisee shall cancel any pending advertising for the Franchised Business and discontinue future advertising which refers to or connotes any relationship between Franchisee and TPR, and shall cooperate with TPR in any action to cancel a registration of Franchisee as a registered user of the Proprietary Marks;

    18.2.   <u>Payment of Indebtedness</u>. Promptly pay to TPR and its affiliates all sums owing to them from Franchisee. Termination of this Agreement under any circumstances shall not relieve Franchisee of any debt, obligation or liability to TPR or its affiliates which may have accrued hereunder;