18.3. Offer of Certain Assets. Offer, for a period of acceptance of not less than thirty (30) days, to sell to TPR at its then-current fair market value, all or any portion of Franchisee's equipment and supplies used in the Franchised Business;

18.4. Transition of Business. Assist TPR in every way possible to bring about an immediately effective, complete and orderly transfer of Franchisee's students to TPR or to such persons as TPR may designate. Franchisee specifically agrees to assign immediately to TPR or its designee any and all business telephone numbers, Web sites, domain names, and email accounts used by Franchisee in the conduct or promotion of the Franchised Business, and hereby irrevocably appoints and authorizes TPR or its designee to act as Franchisee's attorney-in-fact and agent to effect such assignment;

18.5. Confidentiality. Continue to comply with Section 11 above; and

18.6. Restriction on Competition. Comply with Section 13.2 above.

**19. INSURANCE AND INDEMNIFICATION**

19.1. Insurance. Franchisee shall be solely responsible for all loss or damage arising out of or relating to the operation of the Franchised Business, or arising out of the acts or omissions of Franchisee or any of its owners, officers, agents, employees, servants or contractors in connection with services offered or rendered by Franchisee, and for all claims for damage to property or for injury or death of any persons directly or indirectly resulting therefrom. Franchisee shall obtain, at its own cost and expense, and at all times during the term of this Agreement shall maintain in full force and effect for the Franchised Business, insurance coverage of the types and with minimum policy limits specified by TPR. If the Franchised Business is outside of the U.S. and coverages specified by TPR are not available in the Territory, then Franchisee shall obtain coverage consistent with general commercial practices for educational service businesses in the Territory. In any case, Franchisee shall obtain coverage satisfying all applicable legal requirements in the Territory. The insurance policies shall be written by insurers reasonably satisfactory to TPR, and shall expressly insure and protect TPR and its affiliates as additional named insureds. Franchisee shall furnish to TPR certificates of insurance ("Certificates") evidencing the proper types and minimum amounts of required coverage. All Certificates shall expressly provide that no less than thirty (30) days prior written notice shall be given TPR in the event of material alteration to or cancellation or non-renewal of the coverages evidenced by such Certificates. If Franchisee fails to obtain or maintain in force any required insurance coverage, TPR may, in addition to other remedies it may have, maintain or obtain such insurance coverage for Franchisee, and Franchisee shall promptly reimburse TPR for all premiums and other costs incurred thereby.

19.2. Indemnification By Franchisee. Franchisee shall indemnify and hold TPR harmless against and from any and all claims, loss, damages or liability, including attorneys' fees and costs of defense, arising out of or relating to the operation of the Franchised Business or any breach of this Agreement by Franchisee. TPR shall give Franchisee reasonable notice of any suit or action instituted or threatened against TPR for which TPR intends to seek indemnification hereunder. TPR shall have the right to direct and control the defense and settlement of any such suit or action, but Franchisee shall have the right to participate in the defense with counsel of its own choosing, at Franchisee's sole expense. Franchisee's obligation under this indemnity will survive the termination of this Agreement and is not limited to the policy limits of any applicable insurance coverage.

## 20. ADDITIONAL PROVISIONS FOR INTERNATIONAL FRANCHISES

The provisions of this Section 20 shall have effect if the Territory is outside of the United States of America:

20.1. Payments in United States Currency. Except as otherwise provided in Section 20.2 below, Franchisee shall make all payments to TPR and its affiliates in U.S. dollars. Franchisee may arrange for such payments to be made from within or outside the Territory, provided that Franchisee gives TPR reasonable notice of its arrangements for payment and that such arrangements comply with all applicable laws. For purposes of calculating any payments which require conversion from the currency of the Territory to U.S. dollars, the currency of the Territory shall be converted to U.S. dollars at the New York selling rate for U.S. dollars quoted by The Wall Street Journal for the last Business Day of the month preceding the month in which the payment is due. Franchisee shall bear the expense of any foreign exchange levy imposed on the purchase of U.S. dollars in the place from which Franchisee remits payment.

20.2. Exchange Controls. Franchisee shall, at Franchisee's expense, secure all exchange clearances, currency control authorizations, and other governmental releases, if any, necessary from time to time to permit Franchisee to remit payments of U.S. dollars to TPR and its affiliates. If any restrictions are imposed in the place from which Franchisee remits payment on the purchase of U.S. dollars or on the transfer of U.S. dollars by Franchisee to TPR and its affiliates, Franchisee shall immediately notify TPR in writing and use its best efforts to obtain any waivers, consents, or authority that may be necessary to effect payment in U.S. dollars. If Franchisee is unable to obtain such authority despite its best efforts, then until payments can again be sent to TPR and its affiliates in U.S. dollars, payments shall be remitted in such other currency as TPR may designate, to such bank account or other location as TPR may designate. If payment cannot be made in any other fashion designated by TPR, the funds shall be deposited in an account in the name of TPR in a bank in the Territory designated by TPR until other arrangements are available.

20.3. Taxes. Section 8.10 is deleted and replaced with the following:

> All payments to TPR shall be made without deduction for any taxes, except that Franchisee shall deduct and pay to the appropriate government authority, on behalf of TPR, any taxes that may be owed by TPR under the laws of the Territory and that Franchisee is obligated by law to withhold ("Withholding Taxes"). Franchisee shall provide TPR with official receipts or other evidence of payment from such taxing authorities sufficient to enable TPR to support a claim for credit against TPR's U.S. income taxes with respect to the taxes withheld and paid by Franchisee. If Franchisee fails to withhold or to pay any Withholding Taxes, Franchisee shall indemnify TPR for the full amount of such taxes and for any loss or liability (including penalties, interest, and expenses) occasioned by Franchisee's failure to withhold or to pay such taxes as required by law. If TPR is unable to claim a credit against its U.S. income taxes with respect to any Withholding Taxes, Franchisee shall pay to TPR, in addition to the amount to which TPR is otherwise entitled, the additional amount necessary to ensure that, after deducting Withholding Taxes, the net amount actually received by TPR equals 8% of Gross Receipts. All other taxes and duties imposed now or in the future under the laws of the Territory (or by any taxing authority therein) on payments by Franchisee to TPR, or otherwise incurred in connection with the Franchised Business, including but not limited

to stamp taxes, value-added taxes, consumption taxes, and sales taxes, shall be solely Franchisee's responsibility, and Franchisee shall transmit such taxes to the appropriate fiscal authorities. Franchisee shall notify TPR within thirty (30) days of any material changes in taxes and duties imposed on Franchisee or TPR under the laws of the Territory.

20.4. Assistance with Visas. At TPR's request, Franchisee shall assist in obtaining visas required for TPR's representatives to enter the Territory to carry out any of the provisions of this Agreement, including but not limited to the inspections referred to in Section 9.5 above. TPR shall have no liability to Franchisee for any delay or failure of performance resulting from the inability to secure visas or work permits for TPR's representatives. TPR's representatives shall have no obligation to undertake any travel contrary to U.S. State Department travel advisories or restrictions.

20.5. Conflicts with Local Law. Where applicable laws in the Territory conflict with the terms of this Agreement, the applicable laws shall prevail and supersede the terms of this Agreement, provided that, nothing shall impair the obligations of Franchisee to TPR hereunder. If any material provision of this Agreement is superseded under this Section 20.5, TPR shall have the right to terminate this Agreement by written notice to Franchisee. Compliance of this Agreement and the conduct of the Franchised Business in accordance with all laws and regulations of the Territory is solely Franchisee's obligation, and TPR makes no representation, and shall have no liability, with respect thereto.

20.6. Government Approval. If any applicable law in the Territory requires the approval of this Agreement by, or registration of this Agreement with, any local, provincial, or national government authorities ("Government Authorities"), Franchisee shall promptly apply for such approval or registration in accordance with the applicable law. Franchisee shall bear all costs and expenses of obtaining such required approvals or registration. Franchisee shall copy TPR on all communications with the relevant Government Authorities, and shall otherwise keep TPR fully informed regarding such approvals or registration and permit TPR or its representative to participate in any meetings or correspondence with the relevant Government Authorities. If a Government Authority requires any modification of this Agreement as a condition of approving or registering this Agreement, TPR and Franchisee agree to use their best efforts to comply with such condition. However, if either of the parties considers such modification to be material and adverse to it, then that party may: (i) refuse to execute or proceed with this Agreement, if the parties did not execute this Agreement prior to its submission to the Government Authorities, or (ii) within ten (10) Business Days after receiving notice of the required modification, terminate this Agreement by giving written notice to the other party, without incurring liability to the other party. If Franchisee has not obtained all required approvals or registration of this Agreement by the Start-Up Deadline, TPR shall have the right to terminate this Agreement by written notice to Franchisee, without incurring any liability to Franchisee.

20.7. Disputes. Section 21.11 is deleted and replaced with the following: Except as provided in Section 20.7.4 below, all claims and controversies shall be submitted to arbitration pursuant to the then-prevailing International Arbitration Rules of the American Arbitration Association (the "Rules") before a single arbitrator chosen by the parties, but if the parties cannot agree, then chosen as provided in the Rules. Any issue regarding arbitrability or enforcement of this Section shall be governed by the Federal Arbitration Act of the United States.

20.7.1. The arbitration proceeding shall be held at the office of the American Arbitration Association closest to TPR's principal place of business; and the parties hereby waive all questions of personal jurisdiction and venue for the purpose of carrying out this Section. The proceedings and all documents submitted in connection therewith shall be in the English language.

20.7.2. The parties agree that the arbitrator may make any award or awards or enter such order or orders, including an injunction or specific performance, as may be deemed appropriate by the arbitrator, but shall have no authority to award punitive or exemplary damages. TPR and Franchisee each waive any right to seek punitive or exemplary damages from the other, whether in arbitration or in litigation, and they agree that, in the event of a dispute between them, each shall be limited to the recovery of actual damages sustained by it. Except as provided in Section 20.7.4 below, such award or awards shall be the sole remedy between the parties hereto regarding any claims, counter-claims, issues, or accounting presented or pled to the arbitrator. A decision of the arbitrator shall have no collateral estoppel effect with respect to any person or entity who is not a party to the arbitration proceeding.

20.7.3. All awards shall be promptly payable in United States dollars, free of any tax deduction or offset; and any costs, fees, or taxes incident to enforcing such award shall, in the maximum permitted by law, be charged against the party resisting such enforcement. Judgment on the award may be entered by either party in any court of competent jurisdiction. The award shall include interest from the date of any damages incurred as a result of a breach of this Agreement until the award is paid in full, at a rate to be fixed by the arbitrator.

20.7.4. Nothing herein shall be deemed to bar either party's right to obtain injunctive or declaratory relief in any court of competent jurisdiction against conduct or threatened conduct that will cause it loss or damage.

## 21. GENERAL PROVISIONS

21.1. Section Headings. Section headings are for ease of reference only. They are not a part of this Agreement and shall not limit or define the meaning of any provision.

21.2. Non-Waiver. No delay or failure by TPR to exercise any right hereunder or to take action on account of any default by Franchisee, whether in a single instance or repeatedly, shall constitute a waiver of such right or of such default or of the performance required of Franchisee hereunder.

21.3. No Right to Sublicense. Franchisee has no right to sublicense the TPR Method, any of the Proprietary Marks, or the operation or management of the Franchised Business to any other party.

21.4. Invalidity. If any provision of this Agreement is held invalid or unenforceable, either in its entirety or partially, or because of its application to particular circumstances, the provision shall be deemed modified to the extent necessary to render the provision valid or inapplicable, or to be eliminated from this Agreement, if required, and this Agreement shall be construed and enforced as if such provision had been originally so modified or eliminated. If total or partial invalidity or unenforceability of any provision of this Agreement exists only with respect to the laws of a particular jurisdiction, this Section shall apply only to the extent that the laws of such jurisdiction are controlling.

21.5. Force Majeure. Neither party will be liable for any delay in performance due to natural disaster, riot, war, acts of terrorism, general strike, or similar causes beyond the reasonable control of the party. The time period for the performance of an obligation under this Agreement will be extended for the amount of time of the excusable delay. This clause will not extend the term of this Agreement.

21.6. Entire Agreement. This Agreement and the documents referred to herein constitute the entire agreement of the parties with respect to the subject matter hereof. This Agreement supersedes any prior written or oral agreements, representations, correspondence or negotiations concerning the same subject matter. No representations, understandings, agreements, terms or conditions not contained or referred to in this Agreement are binding on the parties. Except as expressly provided herein, this Agreement may be modified only by a written document signed by Franchisee and by TPR's CEO, President, or Executive Vice President-Course Division.

21.7. Survival of Obligations. All obligations of Franchisee which expressly or by implication are to be performed after the expiration or termination of this Agreement shall survive such expiration or termination.

21.8. Relationship of the Parties. This Agreement does not create the relationship of principal and agent, joint venturers, or partners between TPR and Franchisee, and in no circumstances shall Franchisee be considered an agent of TPR. Franchisee agrees that it will do nothing to give the impression that it is an agent of TPR or attempt to create any obligation on behalf of or in the name of TPR. As directed by TPR, Franchisee shall identify itself at its premises and on stationery, business cards, business checks, and other written materials as a franchisee of TPR operating the Franchised Business pursuant to this Agreement.

21.9. Acknowledgments. Franchisee acknowledges and agrees that the business results achieved, and the financial returns and profits, if any, expected or realized from the investment in, and the operation of, the Franchised Business depend principally and substantially on Franchisee's direct, personal and active, continuous participation in the management, administration and operation of the Franchised Business. Franchisee acknowledges that TPR does not warrant, represent, or guarantee the success or profitability of the Franchised Business. Franchisee further acknowledges that TPR's corporate parent, The Princeton Review, Inc., is a publicly-traded company as of the date of this Agreement. Franchisee agrees that, as long as The Princeton Review, Inc. continues to be publicly-traded, Franchisee shall provide at least 48 hours advance notice to TPR of any press releases or similar communications by Franchisee in order to permit TPR to evaluate whether the communication may trigger any disclosure or other obligations of The Princeton Review, Inc. under applicable securities laws.

21.10. Governing Law. The common law of the State of New York, U.S.A. shall govern any claim or controversy regarding the making, entering into, performance, interpretation or enforcement of this Agreement, without giving effect to New York conflict-of-law rules.

21.11. Forum for Litigation. Except as otherwise provided for non-U.S. franchises in Section 20.7, any legal proceeding initiated by Franchisee against TPR and/or its affiliates shall be filed in the federal or state court where TPR has its principal offices at the time of the filing. Any legal proceeding initiated by TPR against Franchisee may be filed either in the Territory or where TPR has its principal offices at the time of the filing. The parties waive all questions of personal jurisdiction and venue for purposes of carrying out this provision.

21.12. Counterparts. This Agreement may be executed in any number of identical counterparts, and each such counterpart shall be deemed a duplicate original hereof.

21.13. Notices. Any notice pursuant to this Agreement shall be in writing, in English, and shall be sent by mail, return receipt requested, postage fully prepaid; by telecopy, with a confirmation copy mailed within three (3) Business Days; or by a commercial delivery service of recognized international standing. Notices shall be addressed as follows:

If to Franchisee: as shown in Appendix A

If to TPR: CEO, President, or Executive VP of Course Division
The Princeton Review, Inc.
2315 Broadway
New York, NY 10024
Fax: 212-874-0775

Franchisee or TPR may change its address for notice at any time upon written notice to the other party.

21.14. Joint and Several Liability. Each individual who signs this Agreement as Franchisee shall be jointly and severally liable for the obligations of Franchisee set forth in this Agreement.

**IN WITNESS WHEREOF**, TPR and Franchisee have executed this Agreement by their duly-authorized representatives on the date or dates indicated below.

**FRANCHISEE**

Date:____________________ ____________________________________

**THE PRINCETON REVIEW, INC.**

Date:____________________ By:_________________________________

Its:_________________________________

# APPENDIX A

## TERMS SPECIFIC TO FRANCHISEE

Territory:

Start-up Deadline:

Initial Franchise Fee:

Authorized Courses:

Authorized Services:

Managing Director:

Notice Address:

**APPENDIX B**

**PROPRIETARY MARKS**

| Mark | Application No. in Territory | Application Date in Territory | Class(es) |
|---|---|---|---|
| **THE PRINCETON REVIEW (logo)** | | | |
| **THE PRINCETON REVIEW** | | | |

**APPENDIX C**
**System Requirements and Network Configurations for Franchise Offices**

## I. General

1. This Appendix C outlines and describes the system and network requirements, responsibilities and support level for Franchised Businesses. The Appendix was last updated on September 15, 2004.

2. All franchisees are responsible for purchasing all of their own hardware and software as specified in the Hardware section (III) and Software section (IV) below. All equipment purchased by Franchisee and used for the Franchised Business must be compliant with the specifications herein or be approved in writing by TPR. Hardware or software purchased that does not meet the specifications provided by this and future versions of this Appendix C will not be supported by TPR.

3. Each Franchised Business office will need a LAN comprising a server, local area network, and some number of desktop PCs. TPR will use best efforts to help Franchisee with the design of the LAN but shall not be required to do so. Any design adopted by Franchisee for use in the Franchised Business must be approved in writing by TPR.

4. TPR's Information Systems team will provide support to Franchisee's standard or approved hardware and software as described in Section V below.

5. Franchisee's employees will be required to access TPR's proprietary hosted course management system called "Yonkers" to provide services to their students. Access to this application shall be provided via TPR's managed IP network.

## II. Connectivity

All franchisees will need to use TPR's designated telecommunications providers to maintain at least a 512kbs connection to TPR's managed IP network. TPR will work closely with Franchisee to coordinate the installation of this network connection and will charge Franchisee on a monthly basis for the out-of-pocket cost of the connection. If Franchisee is unable to connect to TPR's network or obtain reasonable bandwidth using TPR's designated telecommunication providers, alternate methods will need to be arranged. Any additional expenses for labor, hardware, software, or connectivity incurred by TPR for accommodating special connectivity configurations requested by Franchisee will be passed along to Franchisee. Labor charges shall be billed at the rate of $175 per hour.

## III. Hardware

All franchisees must use and purchase hardware as specified by TPR in order to receive desktop, server, network or application support from TPR. DELL is an established provider of high quality computer equipment and is capable of selling and providing support and warranty repairs all over the world. As such, TPR has standardized on DELL computer equipment for all TPR servers, desktop PCs and laptops and will provide support only on equipment sold by DELL. To assist with Franchisee's purchasing needs, TPR will provide Franchisee a contact at DELL who will assist in the purchasing of equipment and software.

Below are lists of DELL equipment that is needed for the Franchised Business along with associated part numbers that are to be used when ordering equipment from DELL. Standard specifications are

subject to frequent changes as defined by TPR. It is the Franchisee's responsibility to check with Information Systems to see whether standard specifications have changed before placing a hardware order.

### 1. Server

Franchisee must use and is responsible for purchasing TPR's standard server and tape backup hardware directly from DELL and having it delivered to Information Systems in New York to be configured. The approximate cost of the server is $3,500. Following is the current standard server configuration:

| | |
|---|---|
| Base Unit: | PowerEdge 2600 2.4GHz/512K 533MHz FSB Xeon (221-2318) |
| Memory: | 2GB DDR SDRAM 266MHZ (4X512) PowerEdge (311-2733) |
| Hard Drive: | 36GB 10K RPM Ultra 320 SCSI Hard Drive (340-6863) |
| Hard Drive Controller: | PERC4/Di 128MB (2 Internal Channels) (340-6467) |
| Floppy Disk Drive: | Floppy Drive,1.44M,F3,NBZL TEAC2 (340-3640) |
| Operating System: | No Operating System,For DELL PowerEdge Servers,No Windows 2000 (420-5100) |
| CD-ROM Drive: | 24X IDE CD-ROM (313-1281) |
| Documentation Diskette: | Electronic Documentation on CD (310-0438) |
| Additional Storage Products: | 36GB 10K RPM Ultra 320 SCSI Hard Drive (340-6863) |
| Feature: | Split Backplane,Drives att. to PERC4/Di, RAID 1,RAID 5 (340-6485) |
| Feature: | Tower Chassis Orientation,P260 (310-1720) |
| Service: | Type 2 Contract - Same Day 4-Hour 7x24 Parts and Labor On-Site Response, Initial Year (900-2960) |
| Service: | Type 2 Contract - Same Day 4-Hour 7x24 Parts and Labor On-Site Response, 2YR Extended (900-2962) |
| Misc: | Redundant Power Supply,PE2600 (310-1726) |
| Misc (if needed): | 36GB 10K RPM Ultra 320 SCSI Hard Drive (340-6863) |
| Misc (if needed): | 36GB 10K RPM Ultra 320 SCSI Hard Drive (340-6863) |
| Misc (if needed): | 36GB 10K RPM Ultra 320 SCSI Hard Drive (340-6863) |

### 2. Backups

The server must have a tape backup system to guard against potential data loss in the case of emergencies. Franchisees are responsible for managing their backups locally. Information Systems will assist in supporting and setting up the process, but the backup operation and the daily switching of backup tapes will be performed by Franchisee. Backup tapes are used by Information Systems to restore data if needed. TPR will not be held responsible if data is lost because of Franchisee's improper management of the backup process.

#### a. Server Tape Backup

The approximate cost is $1,500. The following must be purchased in addition to the server:

- VXA-1i LVD Internal Drive - Black (A0068730)
- 29160 Kit (A0040638)
- (10) V17 VXAtape, 170m, 33-66GB' (A0068738)

#### b. Battery Backup

TPR's current standard UPS is an APC Smart-UPS 750VA USB XL 120V 750VA, 600W battery backup, 8-outlets with PowerChute Smart-UPS Bundle. The manufacturer part number is SUA750XL. It can be ordered online at cdw.com; the CDW part number is 387161. The approximate cost is $400.

### 3. Desktop PC and/or Laptop

Franchisee is responsible for purchasing TPR's standard desktop PC and/or laptop from DELL. Before either can be used for the Franchised Business, it must be configured with the standard TPR desktop or laptop image. The approximate cost for the desktop is $900, and for the laptop is $1,600.

**a. Desktop**

| | |
|---|---|
| Base Unit: | DELL OptiPlex GX280,Small MinitowerPentium 4 520 / 2.80GHz 1M,800FSB (221-5297) |
| Memory: | 512MB, Non-ECC, 400MHz DDR, 2x256, GX270/XS270 (311-2873) |
| Keyboard: | DELL PS/2 Keyboard in Gray, NoHot Keys, Optiplex (310-1515) |
| Video Card: | Integrated Video - Intel DVMT,GX260/GX270 (320-0428) |
| Hard Drive: | 40GB EIDE, 7200 RPM, ATA/100 Hard Drive, GX260 (340-8889) |
| Floppy Disk Drive: | 3.5 inch, 1.44MB, Floppy DriveGX270 (340-8733) |
| Operating System: | Windows XP Professional Service Pack 1,NTFS,with MediaDELL OptiPlex,English,Factory Install (420-2119) |
| NIC: | Integrated Intel Gigabit NIC, 10/100/1000, with Alert Standards Format, GX260/GX270 (430-0353) |
| CD-ROM: | 48X CD-ROM, EIDE, Small Desktop or Minitower, GX260 and GX270 (313-1159) |
| Sound Card: | Integrated Sound Blaster Compatible AC97 Sound, OptiPlex (313-8170) |
| Speakers: | Internal Chassis Speaker Option, Optiplex GX240/270 (313-1495) |

**b. Laptop**

| | |
|---|---|
| Base Unit: | DELL Latitude D600, 1.30GHz, Pentium M, 14.1 XGA, English (221-1829) |
| Memory: | 256MB, 1 Dimm, Double Data Rate for DELL Latitude D-FAM (311-1873) |
| Hard Drive: | 30GB Hard Drive 9.5MM 4200RPM for DELL Latitude D-FAM, FactoryInstall (340-7877) |
| Floppy Disk Drive: | No Floppy Drive for Latitude D-Family Notebooks (340-8854) |
| Operating System: | Windows XP ProSP1, English for DELL Latitude DFAM Notebooks, Factory Install (420-1946) |
| Modem: | Internal 56K Modem for DELL Latitude D-Family Notebooks, Factory Install (313-1535) |
| TBU: | 65W AC Adapter for Latitude D-Family (310-4225) |
| CD-ROM Drive: | 24X CDRW for Latitude D-FamilyFactory Install (313-1531) |
| Processor Cable: | Intel PRO/Wireless 2100 WLAN (802.11b, 11Mbps) miniPCI CardFact (430-0483) |
| Feature: | 6-Cell Primary Battery for DELL Latitude D600/D500 Notebooks, Factory Install (312-0054) |

**4. Scanner**

A Pearson Opscan Insight 4 scanner is required for Yonkers to electronically score tests. Franchisee is responsible for purchasing the scanner, which costs approximately $6,000. TPR has a contract with Pearson and will assist with the purchase process.

## IV. Software

Franchisee is responsible for purchasing and properly licensing all required software and for ongoing license management. When software is to be installed by TPR, Franchisee must provide TPR with purchased licenses and keys to enable TPR to complete the installation. TPR has a standard software suite for the server, desktop and laptop. Franchisee will be responsible for purchasing all or some of the following as directed by TPR:

**1. Server**

a. Windows 2003 Server
b. MS Exchange Server 2003
c. PCAnywhere V10 or above
d. Symantec Norton Antivirus Corporate Edition V7

**2. Desktop and Laptop**

a. Windows XP Pro
b. Office Pro 2000 or higher
c. Symantec Ghost Console Client v75.00.335
d. Symantec Norton Anti-Virus Corporate Edition v7

## V. Information Systems Support

Information Systems will provide remote support only for hardware and software that are approved and that conform to the standards as defined by TPR. Information Systems will support the server,

PC desktops, laptops, network connectivity, network equipment such as routers and or switches, operating systems, Exchange, Microsoft Office, and Anti-Virus software. Information Systems will remotely manage desktop PCs and laptops; this support includes but is not limited to security patch management.

**1. Problem Reporting and Support Hours**

Unless a problem is an emergency, Franchisee employees are to report problems to the Information Systems Helpdesk via the Information Systems ticketing system. The Helpdesk will be staffed between 8 AM and 10 PM Eastern Time Monday through Friday, except U.S. holidays ("Regular Support Hours"). Emergency problems may be reported to the Helpdesk by telephone regardless of the day or time. Information Systems will, in its sole discretion, determine whether such a problem is an emergency and reserves the right to defer resolution until Regular Support Hours.

**2. Supported Hardware Lifespan**

Information Systems will support all hardware other than tape drives for three years from the installation date. Information Systems reserves the right to withhold support beyond such period. Ordinary wear and tear may dictate earlier replacement of tape drives. Information Systems reserves the right to withhold support on a tape drive if Information Systems in its sole discretion judges the drive to be beyond its useful life.

## APPENDIX D

## STANDARDS OF PERFORMANCE

Franchisee must satisfy the following performance standards:

1. Score Improvement

   a. Results of testing can be measured objectively; the improvement of each student is the difference between his final test score and his most recent prior test score. If the student has not previously taken a particular test or preliminary test before enrolling in the course, a comparison will be made with the student's first diagnostic test score.

   b. To be satisfactory, students' results for each test offered by Franchisee must approximate or exceed system-wide results for that particular test. Franchisee's performance will be deemed unsatisfactory if, for three successive terms, his students' testing results for a specific test are more than twenty-five percent (25%) below the average results of all students of all Live Test Prep sites for that test for that term.

2. Student Satisfaction Ratings

   a. TPR measures student satisfaction by, among other things, asking students to respond to a survey after completing a course. Franchisee must make all reasonable efforts to obtain completed surveys from students.

   b. Franchisee's performance will be deemed unsatisfactory if, for three successive terms: (i) Franchisee's response rate for completed surveys is more than 20% below the average response rate system-wide of all students of all Live Test Prep sites for that test for that term; or (ii) Franchisee's student satisfaction ratings, as determined from the completed surveys, are more than 20% below the average satisfaction ratings of all students of all Live Test Prep sites for that test for that term.

**PERSONAL GUARANTY**

As an inducement to THE PRINCETON REVIEW, INC. ("TPR"), a corporation organized under the laws of the State of Delaware, U.S.A., to execute a THE PRINCETON REVIEW™ Franchise Agreement (the "Agreement") dated ____________________ with ______________________________________________ ("Franchisee"), a company organized under the laws of ______________________, ______________________________ and __________________________ (collectively, the "Guarantors"), jointly and severally, hereby unconditionally guarantee to TPR, its affiliates and their successors and assigns that all of Franchisee's obligations under the Agreement and under other agreements or arrangements between Franchisee and TPR, its affiliates, or their successors and assigns, will be punctually paid and performed.

Upon demand by TPR, the Guarantors will immediately make each contribution or payment required of Franchisee under the Agreement, and under other agreements or arrangements between Franchisee and TPR, its affiliates, or their successors and assigns. The Guarantors hereby waive any right to require TPR to: (a) proceed against Franchisee for any contribution or payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee; or (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee. Without affecting the obligations of the Guarantors under this Guarantee, TPR may, without notice to the Guarantors, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee. The Guarantors waive notice of amendment of the Agreement and notice of demand for contribution or payment by Franchisee, and agree to be bound by any and all such amendments and changes to the Agreement.

The Guarantors further agree to defend, indemnify, and hold TPR harmless against any and all losses, damages, liabilities, costs, and expenses (including reasonable attorneys' fees, reasonable costs of investigation, court costs, and arbitration fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of the Franchisee under the Agreement, any amendment thereto, or any other agreement executed by Franchisee referred to therein.

The Guarantors agree to provide financial disclosure to TPR as provided in Section 9.4 of the Agreement.

The Guarantors acknowledge and agree to be bound personally by all covenants not to compete, confidentiality provisions, arbitration provisions, and transfer restrictions contained in the Agreement. Except as expressly authorized by the Agreement, the Guarantors shall not make use of any of TPR's intellectual property rights or goodwill, and shall not disclose to any third party or make use of any of TPR's trade secrets, know-how, systems or methods of which Guarantors may acquire knowledge by virtue of the training they may have received from TPR, their involvement in the business, or their shareholding or directorship in Franchisee.

This Guarantee shall terminate upon the termination or expiration of the Agreement, except that all obligations and liabilities of the Guarantors which arose from events which occurred on or before the effective date of such termination shall remain in full force and effect until satisfied or discharged by the Guarantors, and all covenants which by their terms continue in force after the expiration or termination of the Agreement shall remain in force according to their terms. Upon the death of a Guarantor, the estate of such Guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other Guarantor will continue in full force and effect.

This Guarantee shall be interpreted and construed under the laws of ___________________. In the event of any conflict of law question, the laws of _______________ shall prevail, without regard to, and without giving effect to, the application of the conflict of law rules of such jurisdiction.

IN WITNESS WHEREOF, the Guarantors have signed this Guarantee as of the date of the Agreement.

GUARANTORS:

________________________________ ______________________________________

______________________________________

**ADDENDUM TO THE**
**THE PRINCETON REVIEW FRANCHISE AGREEMENT**
**REQUIRED BY THE STATE OF NEW YORK**

In recognition of the requirements of the New York General Business Law, Article 33, Sections 680 through 695, and of the regulations promulgated thereunder (N.Y. Comp. Code R. & Regs., tit. 13, §§ 200.1 through 201.16), the parties agree to modify the The Princeton Review Franchise Agreement ("Franchise Agreement") as follows:

1. Any provision in the Franchise Agreement that is inconsistent with New York General Business Law, Article 33, Sections 680 – 695 may not be enforceable.

2. Sections 14.1.1 and 16.1.5 are amended to add the following:

   The release required by this Section will not apply to any claim you may have under New York General Business Law, Article 33, Sections 680-695.

3. Section 15 is amended to add the following:

   We will not assign our rights under the Franchise Agreement except to an assignee who in our good faith judgment is willing and able to assume our obligations under the Franchise Agreement.

4. Section 21 is amended to add the following:

   Nothing in this Agreement should be considered a waiver of any right conferred upon you by New York General Business Law, Sections 680-695.

5. This Addendum shall have effect only if the Franchise Agreement and/or the relationship between The Princeton Review and Franchisee satisfy all of the jurisdictional requirements of the New York General Business Law, without considering this Addendum. Except as expressly modified by this Addendum, the Franchise Agreement remains unmodified and in full force and effect.

| **THE PRINCETON REVIEW, INC.** | ______________________________ |
|---|---|
| By______________________________ | By ______________________________ |
| Title_____________________________ | Title _____________________________ |

**ADDENDUM TO THE**
**THE PRINCETON REVIEW FRANCHISE AGREEMENT**
**REQUIRED BY THE STATE OF RHODE ISLAND**

In recognition of the Rhode Island Franchise Investment Act, §§ 19-28.1-1 through 19-28.1-34, the parties agree to modify the The Princeton Review Franchise Agreement ("Franchise Agreement") as follows:

**1.** Section 21 is amended to add the following:

§ 19-28.1-14 of the Rhode Island Franchise Investment Act provides that "A provision in the Franchise Agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act."

**2.** This Addendum shall have effect only if the Franchise Agreement and/or the relationship between The Princeton Review and you satisfy all of the jurisdictional requirements of the Rhode Island Franchise Investment Act, without considering this Addendum. Except as expressly modified by this Addendum, the Franchise Agreement remains unmodified and in full force and effect.

| **THE PRINCETON REVIEW, INC.** | ______________________________ |
|---|---|
| By______________________________ | By ______________________________ |
| Title______________________________ | Title ______________________________ |

**EXHIBIT B**

**FINANCIAL STATEMENTS**

**THE FOLLOWING FINANCIAL STATEMENTS WERE TAKEN FROM TPR'S FO"M 10K REPORTS FILED WITH THE SEC IN 2004 AND 2005.**

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of
The Princeton Review, Inc. and Subsidiaries

We have audited the accompanying consolidated balance sheets of The Princeton Review, Inc. and Subsidiaries (the "Company") as of December 31, 2004 and 2003, and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2004. Our audits also included the financial statement schedule listed in the Index at Item 8. These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of The Princeton Review, Inc. and Subsidiaries as of December 31, 2004 and 2003 and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2004 in conformity with U.S. generally accepted accounting principles. Also, in our opinion the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly, in all material respects, the information set forth herein.

/s/ Ernst & Young LLP

New York, New York
March 18, 2005